Irene WYKE and Joel Smith, Co–Administrators of the Estate of Kenneth Ashe, Deceased, Plaintiffs,

v.

SEA NYMPH, INC., Defendant and Third Party Plaintiff.

OUTBOARD MARINE CORPORATION, Defendant,

v.

MIDAS INTERNATIONAL CORPORATION, Third Party Defendant.

Civ. A. No. C–88–0066–BG(M).

United States District Court, W.D. Kentucky, at Bowling Green.

May 17, 1990.

Gary Becker, Becker Law Office, Louisville, Ky., Buddy Rake, Jr., David O'Daniel, Jolyon Grant, Rake, Copple, Downey and Black, Phoenix, Ariz., for plaintiffs Irene Wyke and Joel Smith.

Michael A. Owsley, English, Lucas, Priest & Owsley, Bowling Green, Ky., for defendant and third party plaintiff Sea Nymph, Inc.

Richard A. Bowman and Marcia M. Kull, Bowman and Brooke, Minneapolis, Minn., William J. Parker, Harlin, Parker & Rudloff, Bowling Green, Ky., for defendant Outboard Marine Corp.

Norman E. Harned, Harned, Anderson & Bachert, Bowling Green, Ky., for third party defendant Midas Intern. Corp.

## MEMORANDUM OPINION

MEREDITH, District Judge.

This matter is before the Court on the defendants', Sea Nymph, Inc., and Outboard Marine Corporation, and Midas International Corporation, motion for summary judgment against the plaintiffs grounded on the plaintiffs' decedent's contributory negligence. A hearing was held in regard to the just-mentioned motion in Bowling Green, Kentucky, on February 22, 1990, where parties were permitted to orally argue their respective positions. Although other motions were pending at the time of the hearing, only the above-mentioned motion was heard, and this Memorandum Opinion and Order will address only that motion.

The plaintiff has filed this combined products liability breach of warranty and negligence action against the defendants, alleging liability for the death of plaintiff's

decedent, Kenneth Ashe, who died as a result of a boating accident that occurred on May 2, 1987, on Lake Cumberland, Kentucky. The jurisdiction of the Court has been invoked pursuant to Title 28, U.S.C. § 1332 and the substantive law of the Commonwealth of Kentucky is applicable.

As a result of having filed a motion for summary judgment, the defendants have certain burdens to hurdle to justify the granting of relief requested as a matter of law. As a party moving for summary judgment, the movant has the initial burden of proving the non-existence of any genuine issue of material fact and that they are entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157–60, 90 S.Ct. 1598, 1608–10, 26 L.Ed.2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Once the movant has sustained its initial burden, then it is incumbent on the non-movant to "set forth specific facts, showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Furthermore, the non-movant may not rely on the pleadings themselves to establish the existence of a genuine issue of fact after the movant has surpassed its initial burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

With regard to the evidentiary standards upon which a motion for summary judgment must be determined, the United States Supreme Court has recently stated:

If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based upon the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—"whether there is [evidence] upon which a jury can proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." *Improvement Co. v. Munson*, 14 Wall 442, 448 [20 L.Ed. 867] (1872).

*Anderson*, 106 S.Ct. at 2512.

The boat involved in this action was a 1981 Sea Nymph Striper boat equipped with a 70 horsepower Evinrude motor. The boat was purchased by the plaintiffs' decedent, Kenneth Ashe, from Huntley Marine located in Pineville, North Carolina, in February of 1982. On Thursday, May 7, 1987, Kenneth Ashe and his brother, Gary Ashe, were at Lake Cumberland, Kentucky, participating in a striped bass fishing tournament. Both men were experienced fishermen, having fished at least twenty-four (24) times a year for the last seven (7) or eight (8) years prior to the accident. In fact, Gary Ashe was ranked number one in the points ranking system for striped bass tournaments. The men had fished Lake Cumberland for three (3) days prior to the accident.

Early in the morning of May 7, 1987 (about 3:00 A.M.), Kenneth and Gary departed the boat dock to go catch their bait for the tournament. The boat was heading upon Wolf Creek, the same creek they had been up the day before.

While traveling up Wolf Creek, Kenneth was standing behind the center console of the boat, which was designed specifically for striped bass fishing, and Gary was standing to the right of the center console. Kenneth, while driving, was also holding a hand-held spotlight so he could see directly in front of the boat, searching for any debris that might be floating in the water. Gary later testified that he had not noticed any floating debris in the water prior to the accident. (Depo. of G. Ashe, pgs. 73, 75, 76). Gary also testified that they had not encountered any underwater obstacles during their prior trip up Wolf Creek.

As the two men were proceeding up Wolf Creek the boat hit something and flipped up on its left side. Jonny Davis, who was

fishing in the area at the time of the accident, and who, along with her husband, were the first persons to find Gary Ashe after the accident, described the conditions of the Lake:

"[T]here is always a lot of debris in the spring, but that time that we found Mr. Ashe it was particularly heavy. Now two days before that there had been debris, because we had stayed out all night."

(Dep. of J. Davis, p. 9).

Herbert Davis more specifically described the conditions in Wolf Creek during the late afternoon and early evening of May 6, 1987 (less than 10 hours before the accident) during his deposition. The colloquy proceeded as follows:

Q. You said the debris was heavy. Could you narratively describe that for us, what conditions you observed as you came down Wolf Creek that afternoon.

A. Well, there are actually complete trees that were floating out in there. And they had no—and the root systems were on those. Some of them were approximately I would say 60 to 80 or 70 feet long. And sometimes they would be bunched up and sometimes they would just be out by themselves scattered a lot.

Q. Were they visible to you in the daylight hours?

A. Yes, in the daylight hours. And that is one of the reasons that once the lake raises up that you have to be pretty careful is because of the debris that comes on the lake. It is washed off the shore line. Where it is on the shore lines back up in the creeks and so forth, it washes into the lake.

(Dep. of H. Davis, pp. 22–22).

Jonny Davis further specifically defined the size of floating debris during her deposition:

Q. Could you describe what you mean by the term "debris"? I mean what are we talking about?

A. We are talking about anything from a little limb a foot long up to whole trees with the roots attached.

Q. There were literally whole trees floating in the lake?

A. Yes. Because I always look at them and think, boy, I would hate to be out here and hit that.

(Dep. of J. Davis, p. 9).

Mrs. Davis further confirmed the presence of debris in the lake during the evening before the accident:

Q. As you came down Wolf Creek in the daylight hours in the afternoon of May 6, did you see this heavy debris that you have previously described?

A. Yes.

Q. Did you see whole trees floating in Wolf Creek on the evening of May 6?

A. Yes.

(Dep. of J. Davis, p. 13).

After fishing the remainder of the night of May 6 and until shortly after daylight on the morning of the 7th, the Davis' headed back up Wolf Creek where they continued to encounter heavy debris even though they were moving very slowly. (Dep. of J. Davis, pp. 13–14; Dep. of H. Davis, p. 27).

Gary Ashe testified that there was a light mist on the water at the time he and his brother left the boat dock, but he said that a fog did not roll in until approximately two hours after the accident. (Dep. of G. Ashe, pp. 114, 115). Gary described the condition of visibility as they moved along in the boat as follows:

It was no problem to see out in front of the boat, you know, in normal—what I would consider a normal distance, you know, for the way were were traveling. I wouldn't think, you know, it wasn't what I considered hard to see. To me it looked like you could see and it was safe.

(Dep. of G. Ashe, p. 136).

Alonzo Harris, Jr., the water patrol officer who was at the scene within a short time after the accident, gave his comments at deposition as to visibility and fog conditions.

"[I]t was so foggy that I couldn't see to run without following the shore line."

At the time of the accident the wind was calm and the water was neither rough nor choppy. (Dep. of G. Ashe, pp. 103, 104). Gary testified that it was not the habit of any of the striper fisherman to wear personal flotation devices. (Dep. of G. Ashe, p. 68).

Under the conditions described above, Kenneth and Gary Ashe were traveling in the boat in the middle of the night with a dense fog at planing speed (at ⅔ to ¾ full throttle) when they struck something floating in the water. The steering console broke loose, and the two men were thrown into the water. At the time the two men were thrown from the boat, neither was wearing a life preserver even though there were life preservers on board. Both men were wearing heavy clothing, including an insulated suit, jeans, flannel shirt and tennis shoes. (Dep. of G. Ashe, pgs. 62, 63, 66, 95, 149).

Gary testified as to his brother's swimming ability as follows:

A. Well, he always, you know, in the times as mentioned, he said he could tread water, you know. I didn't know what he could or what he couldn't do. I mean, I didn't know.

Q. So how good or how poor his swimming was, you don't know?

A. I don't know. Basically I would have thought he couldn't swim. I didn't know of him going swimming any time, you know, which I could swim.

(Dep. of G. Ashe, pp. 148, 149).

After the two men were thrown from the boat, Gary was able to get to Kenneth in the water and began towing him to shore. At that time Kenneth stated that he was "okay." (Dep. of G. Ashe, p. 113). The boat was circling the two men. Gary testified that on the second pass, more waves were created and Kenneth panicked. (Dep. of G. Ashe, p. 113). Kenneth eventually went under and drowned. Gary laid on his back and made his way to shore, where a boat came by and picked him up. At that time they radioed for help. (Dep. of G. Ashe, p. 114).

Alonzo Harris, Jr., the water patrol officer on duty at the time of the accident, stated that in his opinion, based on fifteen (15) years experience as a water patrol officer, if Kenneth Ashe had been wearing a life jacket he "would be with us today." (Dep. of A. Harris, p. 40).

The plaintiffs' expert, Robert Swint, a man with seventeen years of experience investigating boat accidents, testified that the boat and drive system were defective for several reasons. This testimony, in pertinent part, set out at pages 5–7 of the plaintiffs' response to the motion for summary judgment, is not necessary to be recapitulated by the Court for the following reason. The Court finds that the undisputed facts of the case, as espoused, infra, compel it to grant the defendants' and third party defendant's motion for summary judgment. As a result, the alleged defective condition of the boat and drive system is irrelevant, and a discussion of testimony as to these assertions, is wholly fugacious under these circumstances.

Although this case arose from a most unfortunate accident, to which the Court is most sympathetic, the law in the Commonwealth of Kentucky is opposed to a recovery by the plaintiffs even in this most ominous set of circumstances.

■  The plaintiffs' decedent failed to exercise ordinary care, and as a result, under the law of this Commonwealth, the plaintiffs are barred from any recovery as a matter of law.

Kentucky Revised Statute 411.320(3) (hereinafter referred to as KRS) is dispositive of the instant issue. This statute provides that:

In any product liability action, if the plaintiff failed to exercise ordinary care in the circumstances in his use of the product, and such failure was a substantial cause of the occurrence that caused injury or damage to the plaintiff, the defendant shall not be liable whether or not said defendant was at fault or the product was defective.

The Kentucky Supreme Court, in 1986, held that KRS 411.320(3) operates as an absolute bar to recovery in products liability cases where contributory negligence on the part of the plaintiff substantially contributes to the cause of an occurrence which injures the plaintiff despite the adoption of the doctrine of comparative negligence in *Hilen v. Hays*, Ky., 673 S.W.2d 713 (1984); *Reda Pump Company, a Division of TRW, Inc. v. Finck*, Ky., 713 S.W.2d 818 (1986).

■ The Kentucky legislature codified House Bill 551, enacted during its 1988 session, into KRS 411.182, which provides for application of comparative fault principles to all tort actions, including products liability cases. KRS 411.182 became effective July 15, 1988, and the Kentucky Supreme Court has determined that this statute cannot be applied retroactively. *Koching v. International Armament Corp.*, Ky., 772 S.W.2d 634 (1989). (See KRS 446.-080(3)). As the events from which this action stem occurred before July 15, 1988, KRS 411.320(3) applies and a complete bar to recovery can be recognized under the proper circumstances.

The conditions and circumstances surrounding the boat accident that occurred early on the morning of May 7, 1987, in which death resulted to plaintiffs' decedent, are so overwhelming that this Court must deny recovery as a matter of law by virtue of the decedent's contributory negligence.

■ This Court is well aware that it is an exceptional case where a negligence issue can be resolved by summary judgment, and that under Kentucky law, summary judgment should be exercised with caution. *McTavish v. Chesapeake and Ohio Railroad Co.*, 485 F.2d 510 (6th Cir.1973). This approach is reflected by the language in *Bonn v. Sears, Roebuck & Co.*, Ky., 440 S.W.2d 526 (1969):

> "We are aware that caution should be exercised in granting summary judgment in negligence cases, because determination of the issue of fact involved in these cases depends upon the application of the standard of care of an ordinarily prudent individual. The facts and circumstances of individual cases affect the extent of care to be expected from the parties involved."

*Bonn, supra*, at 530. Construing Kentucky law in conjunction with the United States Supreme Court in *Anderson, supra*, 106 S.Ct. at 2512, this Court finds that "reasonable jurors could not find by a preponderance of the evidence that the plaintiffs are entitled to a verdict—." The facts are simply too overwhelming for this Court to determine otherwise. Kenneth and Gary Ashe were familiar with the debris-laden condition of the lake, having fished it for three (3) days prior to the tournament. Although life preservers were on board neither man opted to wear one. Kenneth, as the evidence shows, declined to wear a life preserver despite the fact he could not swim, was wearing heavy clothing, and was planing the boat at ½ to ¾ throttle in the dark with only a hand-held spotlight for lighting. It is disputed as to the fog conditions at the time of the accident; however, the above-mentioned facts stated alone give rise themselves to a finding of negligence, or contributory negligence in this case, on the part of Kenneth Ashe.

The defendants have cited *Christian Appalachian Project, Inc. v. Berry*, Ky., 487 S.W.2d 951 (1972) for authority that Kenneth Ashe was contributorily negligent as a matter of law. In that case the plaintiff brought suit against a recreational facility that rented canoes for adult boating on a lake. The plaintiff's decedent, a 19 year old male, drowned when a canoe he had rented from the defendant capsized. The defendant did not provide the decedent with a life preserver; nor did the decedent, an inexperienced swimmer, request one. After the jury returned a verdict in favor of the plaintiff, the Kentucky Court of Appeals reversed. The Appeals Court held that the decedent's failure to request and wear a life preserver was contributorily negligent as a matter of law. The court stated:

> "We must regard the conduct of the decedent in this case as manifestly unreasonable conduct in encountering a dan-

ger that was obvious to any reasonable person under the circumstances claimed to exist by the plaintiff's evidence."

*Christian Appalachian Project, supra,* at 954.

The plaintiff in the instant action argued at the hearing held February 22, 1990, that *Christian Appalachian Project* can be distinguished on the basis that a canoe is inherently more dangerous than the boat here in question because of a canoe's propensity to tip over easily. Regardless of the distinguishing factor between the two types of watercraft, the Court is unpersuaded by the plaintiff's argument. It appears to this Court that the conduct of Kenneth Ashe was so manifestly unreasonable in encountering a danger that was obvious to any reasonable person under the circumstances that reasonable jurors could only come to the conclusion that the decedent was contributorily negligent.

As a result, KRS 411.320(3) precludes recovery by the plaintiffs' decedent's contributory negligence and the defendants' and third party defendant's motion for summary judgment will be granted.